MIED (Rev 1/31/05) Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus

## PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF
## HABEAS CORPUS BY A PERSON IN STATE CUSTODY

| United States District Court | Dist<br>Eas | Case: 2:07-cv-14033<br>Assigned To: Battani, Marianne O<br>Referral Judge: Scheer, Donald A<br>Filed: 09-25-2007 At 01:51 PM<br>HC BRYANT V. BERGHUIS (DA) |
|---|---|---|
| Name (under which you were convicted) :<br>Matthew Bryant | | |
| Place of Confinement: Earnest C. Brooks Corr. Fac.,<br>2500 S. Sheridan Dr., Muskegon Heights, MI 49444 | | Prisoner No.: 520017 |
| Petitioner (include the name under which you were convicted) | | Respondent (authorized person having custody of petitioner) |
| **MATTHEW BRYANT** | v. | **MARY BERGHUIS** |
| The Attorney General of the State of Michigan: Michael Cox | | |

### PETITION

1. (a) Name and location of court that entered the judgment of conviction you are challenging: <u>3rd Judicial Circuit</u>
   <u>for the County of Wayne 1441 St. Antoine St. Detroit, MI 48226</u>

   (b) Docket or case number (if you know): <u>04-008886-01</u>

2. (a) Date of judgment of conviction (if you know): <u>December 7, 2004</u>
   (b) Date of sentencing: <u>January 12, 2005</u>

3. Length of sentence: <u>Life, 50 to 75, and 6 to 10.</u>

4. In this case, were you convicted on more than one count or of more than one crime?
   ☒ Yes          ☐ No

5. Identify all crimes of which you were convicted and sentenced in this case: <u>First Degree Felony Murder 750.</u>
   <u>316; First Degree Premeditated Murder MCL 750.316; Kidnapping, MCL 750.349; Two Counts of Assault With</u>
   <u>Intent to do Great Bodily Harm Less than Murder, MCL 750.84 and First Degree Criminal Sexual Conduct, MCL</u>
   <u>750.520b</u>

6. (a) What was you plea? (Check one)
   
   ☒ Not guilty          ☐ Nolo contendere (no contest)
   
   ☐ Guilty          ☐ Insanity plea

   (b) If you entered a guilty plea to one count or charge and a not guilty plea to another count or charge,
   what did you plead guilty to and what did you plead not guilty to? _____

MIED (Rev 1/31/05) Petition Under 28 U.S.C. § 2254 for a Writ of Habeas Corpus

(c) If you went to trial, what kind of trial did you have? (Check one)

☒ Jury ☐ Judge only

7. Did you testify at a pretrial hearing, trial, or post-trial hearing?

☐ Yes ☒ No

8. Did you appeal from the judgment of conviction?

9. ☒ Yes ☐ No

If you did appeal, answer the following:

(a) Name of court: Michigan Court of Appeals

(b) Docket or case number (if you know): 260768

(c) Result: Affirm conviction and sentence

(d) Date of result (if you know): September 14, 2006

(e) Citation to the case (if you know): N/A

(f) Grounds raised: See Attachment A

(g) Did you seek further review by a higher state court? ☒ Yes ☐ No

If yes, answer the following:

(1) Name of court: Michigan Supreme Court

(2) Docket or case number (if you know): 132332

(3) Result: Denied

(4) Date of result (if you know): January 29, 2007

(5) Citation to the case (if you know): N/A

(6) Grounds raised: See Attachment B

(h) Did you file a petition for certiorari in the United States Supreme Court?

☐ Yes ☒ No

If yes, answer the following:

(1) Docket or case number (if you know):

(2) Result:

(3) Date of result (if you know):

(4) Citation to the case (if you know):

MIED (Rev 1/31/05) Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus

10. Other than the direct appeals listed above, have you previously filed any other petitions, applications, or motions for relief from judgment pursuant to Subchapter 6.500 of the Michigan Court Rules concerning this judgment of conviction in any state court?　　□　Yes　　☒　No

11. If your answer to Question 10 was "Yes," give the following information:

    (a)  (1)  Name of court: _____

          (2)  Docket or case number (if you know): _____

          (3)  Date of result (if you know): _____

          (4)  Nature of the proceeding: _____

          (5)  Grounds raised: _____

                                                            _____

                                                           _____

                                                           _____

                                                           _____

                                                           _____

                                                           _____

                                                           _____

                                                           _____

          (6)  Did you receive a hearing where evidence was given on your petition, application, or motion?　　□　Yes　　　□　No

          (7)  Result: _____

          (8)  Date of result (if you know): _____

    (b)  If you filed any second petition, application, or motion, give the same information:

          (1)  Name of court: _____

          (2)  Docket or case number (If you know): _____

          (3)  Date of filing (if you know): _____

          (4)  Nature of the proceeding: _____

          (5)  Grounds raised: _____

                                                            _____

                                                           _____

                                                           _____

                                                           _____

                                                           _____

                                                           _____

                                                           _____

          (6)  Did you receive a hearing where evidence was given on your petition, application, or motion?　　　　□　Yes　　　□　No

          (7)  Result: _____

          (8)  Date of result (if you know): _____

MIED (Rev 1/31/05) Petition Under 28 U.S.C. § 2254 for a Writ of Habeas Corpus

(c)  If you filed any third petition, application, or motion, give the same information:

(1)  Name of court: _____

(2)  Docket or case number (if you know): _____

(3)  Date of filing (if you know): _____

(4)  Nature of the proceeding: _____

(5)  Grounds raised: _____

_____

_____

_____

_____

_____

_____

_____

_____

(6)  Did you receive a hearing where evidence was given on your petition, application, or

motion?        □  Yes          □  No

(7)  Result: _____

(8)  Date of result (if you know): _____

(d)  Did you appeal to the highest state court having jurisdiction over the action taken on you petition,

application, or motion?

(1)  First petition:          □  Yes       □  No

(2)  Second petition:      □  Yes       □  No

(3)  Third petition:        □  Yes       □  No

(e)  If you did not appeal to the highest state court having jurisdiction, explain why you did not:

_____

_____

_____

12.  For this petition, state every ground on which you claim that you are being held in violation of the
Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four
grounds.  State the <u>facts</u> supporting each ground.

CAUTION: To proceed in the federal court, you must ordinarily first exhaust (use up) your available
state-court remedies on each ground on which you request action by the federal court. Also, if you fail
to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a
later date.

GROUND ONE:   See Attachment C _____

_____

_____

MIED (Rev 1/31/05) Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus

(a)  Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

See Attachment C

(b) If you did not exhaust you state remedies on Ground One, explain why:

(c)  **Direct Appeal of Ground One:**

    (1)   If you appealed from the judgment of conviction, did you raise this issue?

    ☒  Yes          ☐  No

    (2) If you did not raise this issue in your direct appeal, explain why:

(d)  **Post-Conviction Proceedings:**

    (1)   Did you raise this issue in a motion for relief from judgment pursuant to Subchapter 6.500 of the

        Michigan Court Rules?          ☐  Yes          ☐  No

    (2)   If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

    (3)   Did you receive a hearing on your motion or petition?          ☐  Yes          ☐  No

    (4)   Did you appeal from the denial of your motion or petition?          ☐  Yes          ☐  No

    (5)   If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

    ☐  Yes          ☐  No

    (6)   If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

MIED (Rev 1/31/05) Petition Under 28 U.S.C. § 2254 for a Writ of Habeas Corpus

Result (attach a copy of the court's opinion or order, if available): _____

(7)  If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this
issue: _____
_____
_____
_____

(e)  **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies,

etc.) that you have used to exhaust your state remedies on Ground One: _____
_____
_____

**GROUND TWO:** _SEE ATTACHMENT C_ _____
_____

(a)  Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

__SEE ATTACHMENT C_ _____
_____
_____
_____
_____
_____
_____

(b) If you did not exhaust you state remedies on Ground Two, explain why: _____
_____
_____
_____

(c)  **Direct Appeal of Ground Two:**

(1)  If you appealed from the judgment of conviction, did you raise this issue?
☒  Yes      ☐  No

(2) If you did not raise this issue in your direct appeal, explain why: _____
_____
_____

(d)  **Post-Conviction Proceedings:**

(1)  Did you raise this issue in a motion for relief from judgment pursuant to Subchapter 6.500 of the

Michigan Court Rules?          ☐  Yes          ☐  No

(2)  If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: _____
Name and location of the court where the motion or petition was filed: _____
_____

Docket or case number (if you know): _____

MIED (Rev 1/31/05) Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(3)  Did you receive a hearing on your motion or petition?

☐  Yes          ☐ No

(4)  Did you appeal from the denial of your motion or petition?

☐  Yes          ☐ No

(5)  If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

☐  Yes          ☐ No

(6)  If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

(7)  If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this

issue: _____

_____

_____

_____

(e)  **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies,

etc.) that you have used to exhaust your state remedies on Ground Two: _____

_____

_____

**GROUND THREE:**  SEE ATTACHMENT C _____

_____

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

SEE ATTACHMENT C _____

_____

_____

_____

_____

(b) If you did not exhaust your state remedies on Ground Three, explain why: _____

_____

7

(c) **Direct Appeal of Ground Three:**

    (1) If you appealed from the judgment of conviction, did you raise this issue?

        ☒ Yes       ☐ No

    (2) If you did <u>not</u> raise this issue in your direct appeal, explain why: _____

    _____

    _____

(d) **Post-Conviction Proceedings:**

    (1) Did you raise this issue in a motion for relief from judgment pursuant to Subchapter 6.500 of the

    Michigan Court Rules?         ☐ Yes     ☐ No

    (2) If your answer to Question (d)(1) is "Yes," state:

    Type of motion or petition: _____

    Name and location of the court where the motion or petition was filed: _____

    _____

    Docket or case number (if you know): _____

    Date of the court's decision: _____

    Result (attach a copy of the court's opinion or order, if available): _____

    _____

    _____

    (3) Did you receive a hearing on your motion or petition?

        ☐ Yes      ☐ No

    (4) Did you appeal from the denial of your motion or petition?

        ☐ Yes      ☐ No

    (5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

        ☐ Yes      ☐ No

    (6) If your answer to Question (d)(4) is "Yes," state:

    Name and location of the court where the appeal was filed: _____

    _____

    Docket or case number (if you know): _____

    Date of the court's decision: _____

    Result (attach a copy of the court's opinion or order, if available): _____

    _____

    (7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this

    issue: _____

    _____

    _____

    _____

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies,

    etc.) that you have used to exhaust your state remedies on Ground Three: _____

    _____

MIED (Rev 1/31/05) Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus

**GROUND FOUR:** _SEE ATTACHMENT C_

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

__SEE ATTACHMENT C__

(b) If you did not exhaust you state remedies on Ground Four, explain why: _____

(c) **Direct Appeal of Ground Four:**

(1) If you appealed from the judgment of conviction, did you raise this issue?
☒ Yes              ☐ No

(2) If you did <u>not</u> raise this issue in your direct appeal, explain why: _____

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue in a motion for relief from judgment pursuant to Subchapter 6.500 of the Michigan Court Rules?
☐ Yes              ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed: _____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

(3) Did you receive a hearing on your motion or petition?
☐ Yes              ☐ No

(4) Did you appeal from the denial of your motion or petition?
☐ Yes              ☐ No

9

MIED (Rev 1/31/05) Petition Under 28 U.S.C. § 2254 for a  Writ of Habeas Corpus

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

☐ Yes                ☐ No

(6)  If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed:  _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):  _____

_____

_____

_____

(7)  If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this
issue: _____

_____

_____

_____

(e)  **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies,

etc.) that you have used to exhaust your state remedies on Ground Four: _____

_____

_____

_____

13.  Please answer these additional questions about the petition you are filing:

(a)  Have all grounds for relief that you have raised in this petition been presented to the highest state

court having jurisdiction?                 ☒ Yes              ☐ No

If your answer is "No," state which grounds have not been so presented and give your reason(s)

for not presenting them: _____

_____

_____

_____

(b)  Is there any ground in this petition that has not been presented in some state or federal court? If

so, which ground or grounds have not been presented, and state your reasons for not presenting

them: _____

_____

_____

_____

14.  Have you previously filed any type of petition, application, or motion in a federal court regarding the

conviction that you challenge in this petition?           ☐ Yes          ☒ No

if "Yes," state the name and location of the court, the docket or case number, the type of proceeding,

the issues raised, the date of the court's decision, and the result for each petition, application, or

motion filed. Attach a copy of any court opinion or order, if available. _____

MIED (Rev 1/31/05) Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus

(15). Do you have any petition or appeal now pending (filed and not decided yet) in any court, either state federal, for the judgment you are challenging?　　　　□ Yes　　　☒ No
If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised. _____

16.  Give the name and address, if you know, of each attorney who represented you in the following stages of the judgment you are challenging:

(a) At preliminary hearing:  Robert W. Plumpe (P-22965) 3200 W. 12 Mile Rd Ste 108 Warren, MI 48092

(b) At arraignment and plea:  N/A

(c) At trial:  Robert W. Plumpe (P-22965) 3200 W. 12 Mile Rd Ste 108 Warren, MI 48092

(d) At sentencing:  Robert W. Plumpe (P-22965) 3200 W. 12 Mile Rd Ste 108 Warren, MI 48092

(e) On appeal:  Robin M. Lerg (P-40297) 3001 W. Big Beaver Rd.Ste 324 Troy, MI 48084

(f) In any post-conviction proceeding:  N/A

(g) On appeal from any ruling against you in a post-conviction proceeding:  N/A

17.  Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?　　　　□ Yes　　　☒ No
(a)  If so, give name and location of court that imposed the other sentence you will serve in the future:

(b)  Give the date the other sentence was imposed: _____
(c)  Give the length of the other sentence: _____
(d)  Have you filed, or do you plan to file, any petition that challenges the judgment or sentence to be served in the future?　　　　□ Yes　　　□ No

MIED (Rev 1/31/05) Petition Under 28 U.S.C. § 2254 for a Writ of Habeas Corpus

Therefore, petitioner asks that the Court grant the following relief:   That Respondent be required to appear and answer the allegations of this petition; this Court relieve Mr. Byrant of the unconstitutional restraint on his liberty; that this Court grant such other relief as the Court may deem proper;

or any other relief to which petitioner may be entitled.

_____

Signature of attorney (if any)

_____

Address

_____

_____

Telephone number

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Petition for Writ of Habeas Corpus was placed in the prison mailing system on

_09/21/07_____ (Month, date, year).

Executed (signed) on _09/21/07_____ (date).

_____

Signature of Petitioner - Matthew Bryant

If the person signing is not petitioner, state relationship to petitioner and explain why petitioner is not signing this petition. _____

_____

_____

* * * * *

# ADDITIONAL GROUNDS

**GROUND FIVE:** SEE ATTACHMENT C

(a) Supporting FACTS (Do not argue or cite law.  Just state the specific facts that support your claim.):   SEE

ATTACHMENT C

(b)   **Direct Appeal of Ground Five:**

(1)   If you appealed from the judgment of conviction, did you raise this issue?      Yes ☒  No ☐

(2)   If you did not raise this issue in your direct appeal, explain why:

(c)   **Post-Conviction Proceedings:**

(1)   Did you raise this issue in a motion for relief from judgment pursuant to Subchapter 6.500 of the Michigan Court Rules?   Yes ☐  No ☐

(2)   If your answer to Question (d)(1) is "Yes," state:

Date motion was filed:

Name and location of the court where the motion was filed:

Docket or case number:

Result (attach a copy of the court's opinion and order, if available):

Date of result:

(3)   Did you receive a hearing on your motion?   Yes ☐  No ☐

(4)   Did you appeal from the denial of your motion?   Yes ☐  No ☐

(5)   If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?   Yes ☐  No ☐

If yes, answer the following:

Date you filed: _____

Name and location of court: _____

Docket or case number: _____

Result (attach a copy of the court's opinion and order, if available): _____

_____

Date of result: _____

(d)   **Other Remedies**: Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Five: _____

_____

_____

(e) If you did not exhaust your state remedies on Ground Five, explain why: _____

_____

_____

**GROUND SIX:** _____

_____

(a) Supporting FACTS (Do not argue or cite law. Just state the specific facts that support your claim.): _____

_____

_____

_____

_____

_____

(b)   **Direct Appeal of Ground Six:**

(1)   If you appealed from the judgment of conviction, did you raise this issue?      Yes ☐  No ☐

(2)   If you did not raise this issue in your direct appeal, explain why: _____

_____

_____

(c)   **Post-Conviction Proceedings:**

(1)   Did you raise this issue in a motion for relief from judgment pursuant to Subchapter 6.500 of the Michigan Court Rules?   Yes ☐  No ☐

(2)   If your answer to Question (d)(1) is "Yes," state:

Date motion was filed: _____

Name and location of the court where the motion was filed: _____

_____

Docket or case number: _____

Result (attach a copy of the court's opinion and order, if available): _____

_____

Date of result: _____

(3)   Did you receive a hearing on your motion?   Yes ☐  No ☐

(4)   Did you appeal from the denial of your motion?   Yes ☐  No ☐

(5)   If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?   Yes ☐  No ☐

If yes, answer the following:

Date you filed: _____

Name and location of court: _____

Docket or case number: _____

Result (attach a copy of the court's opinion and order, if available): _____

_____

Date of result: _____

(d)   **Other Remedies**: Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Six: _____

_____

_____

(e)   If you did not exhaust your state remedies on Ground Six, explain why: _____

_____

_____

**GROUND SEVEN:** _____

_____

(a) Supporting FACTS (Do not argue or cite law.  Just state the specific facts that support your claim.):  _____

_____

_____

_____

_____

_____

_____

(b)  **Direct Appeal of Ground Seven:**

    (1)  If you appealed from the judgment of conviction, did you raise this issue?      Yes ☐  No ☐

    (2)  If you did not raise this issue in your direct appeal, explain why:  _____

_____

_____

(c)  **Post-Conviction Proceedings:**

    (1)  Did you raise this issue in a motion for relief from judgment pursuant to Subchapter 6.500 of the Michigan Court Rules?   Yes ☐  No ☐

    (2)  If your answer to Question (d)(1) is "Yes," state:

Date motion was filed: _____

Name and location of the court where the motion was filed: _____

_____

Docket or case number: _____

Result (attach a copy of the court's opinion and order, if available):  _____

_____

Date of result: _____

    (3)  Did you receive a hearing on your motion?  Yes ☐  No ☐

    (4)  Did you appeal from the denial of your motion?  Yes ☐  No ☐

    (5)  If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?   Yes ☐  No ☐

If yes, answer the following:

Date you filed: _____

Name and location of court: _____

Docket or case number: _____

Result (attach a copy of the court's opinion and order, if available): _____

_____

Date of result: _____

(d)   **Other Remedies**: Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Seven: _____

_____

_____

(e)  If you did not exhaust your state remedies on Ground Seven, explain why: _____

_____

_____

**GROUND EIGHT:** _____

_____

(a) Supporting FACTS (Do not argue or cite law.  Just state the specific facts that support your claim.): _____

_____

_____

_____

_____

_____

(b)  **Direct Appeal of Ground Eight:**

   (1)   If you appealed from the judgment of conviction, did you raise this issue?     Yes ☐  No ☐

   (2)   If you did not raise this issue in your direct appeal, explain why: _____

_____

_____

(c)   **Post-Conviction Proceedings:**

    (1)   Did you raise this issue in a motion for relief from judgment pursuant to Subchapter 6.500 of the Michigan Court Rules?   Yes ☐   No ☐

    (2)   If your answer to Question (d)(1) is "Yes," state:

Date motion was filed: _____

Name and location of the court where the motion was filed: _____

_____

Docket or case number: _____

Result (attach a copy of the court's opinion and order, if available): _____

_____

Date of result: _____

    (3)   Did you receive a hearing on your motion?   Yes ☐   No ☐

    (4)   Did you appeal from the denial of your motion?   Yes ☐   No ☐

    (5)   If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?   Yes ☐   No ☐

If yes, answer the following:

Date you filed: _____

Name and location of court: _____

Docket or case number: _____

Result (attach a copy of the court's opinion and order, if available): _____

_____

Date of result: _____

(d)   **Other Remedies**: Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Eight: _____

_____

_____

(e)   If you did not exhaust your state remedies on Ground Eight, explain why: _____

_____

_____

_____

## ATTACHMENT A

**Habeas Question 9(f)**

Issues raised in Petitioner's Brief in the Michigan Court of Appeals:

**I**
**THE TRIAL COURT IMPROPERLY NULLIFIED DEFENDANT-APPELLANT'S PEREMPTORY CHALLENGES AGAINST TWO JURORS, FINDING THAT DEFENSE COUNSEL HAD EXERCISED THE CHALLENGES IN A RACIALLY DISCRIMINATORY MANNER.**

**II**
**DEFENDANT-APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO BE PRESENT AND WAS DENIED DUE PROCESS AND HIS SIXTH AMENDMENT RIGHT TO CONFRONTATION WHEN THE TRIAL COURT TWICE REMOVED DEFENDANT FROM HIS TRIAL.**

**III**
**THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN DEFENDANT-APPELLANT'S CONVICTION OF FIRST DEGREE PREMEDITATED MURDER AND FIRST DEGREE FELONY MURDER.**

**IV**
**THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN DEFENDANT-APPELLANT'S CONVICTION OF KIDNAPPING.**

1

**ATTACHMENT B**

**Habeas Question (9)(g)(6)**

The following issues were raised in the Michigan Supreme Court:

I

THE TRIAL COURT IMPROPERLY NULLIFIED DEFENDANT-APPELLANT'S PEREMPTORY CHALLENGES AGAINST TWO JURORS, FINDING THAT DEFENSE COUNSEL HAD EXERCISED THE CHALLENGES IN A RACIALLY DISCRIMINATORY MANNER.

II

DEFENDANT-APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO BE PRESENT AND WAS DENIED DUE PROCESS AND HIS SIXTH AMENDMENT RIGHT TO CONFRONTATION WHEN THE TRIAL COURT TWICE REMOVED DEFENDANT FROM HIS TRIAL.

III

THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN DEFENDANT-APPELLANT'S CONVICTION OF FIRST DEGREE PREMEDITATED MURDER AND FIRST DEGREE FELONY MURDER.

IV

THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN DEFENDANT-APPELLANT'S CONVICTION OF KIDNAPPING.

## ATTACHMENT C

**Habeas Question (12)**

### I

**THE TRIAL COURT IMPROPERLY NULLIFIED DEFENDANT-APPELLANT'S PEREMPTORY CHALLENGES AGAINST TWO JURORS, FINDING THAT DEFENSE COUNSEL HAD EXERCISED THE CHALLENGES IN A RACIALLY DISCRIMINATORY MANNER.**

<u>**Supporting Facts:**</u>

Close to the end of the first day of jury selection, Defendant peremptory removed jurors 12, 13 and 14 (T, 11-30-04, 101) After the jury was excused for the day, the trial court denied the challenges because they appeared to be based on race, pointing out that Defendant's previous peremptory excusals had been against white men and he had begun peremptorily white females (T, 11-30-04, 102) Following a bench conference where the prosecutor asked the trial judge to delay its ruling so that a record could be made, court recessed (T, 11-30-04, 104; 12-1-04, 8).

The matter was revisited before jury selection resumed the following day. The prosecution pointed out that initially, Defendant exercise peremptory excusals against white male jurors, then began peremptorily excusing white female jurors:

> None of these jurors indicated that they had police officer friends. There were some jurors who the defense excused who said that they knew police officers. But the Court didn't neither did I, I had no objection to that. But these people didn't have any reason. There was no religion, there were no police officers, there were no people in their families who had been convicted or murder, or victims of their families who had been victims of murder or any assault cases. There simply just was not articulable reason,. Race-neutral reason, given from the defense (T, 12-1-04, 11)

The defense gave these reasons for exercising the peremptory challenges:

> Now, I mentioned briefly, yesterday, that I will give a reason for the last three,

> that is race-neutral. As far as Ms. Macari, number fourteen, she does have a police officer in her background. I wrote down, 'Police."
>
> THE COURT: I think I remember that.
>
> MR. PLUMPE:[defense counsel]: Correct.
>
> THE COURT: I think that's accurate. Okay.
>
> MR. PLUMPE: And as to Mr. Heiser, we had quite an extended discussion, during voir dire, about the issues of reasonable doubt and so forth.
>
> In addition to that I noticed, and my client probably did too, that he was slouching his shoulders at a significant time during questions. Therefore-- and granted, I was acting in response to my client, because I consult with him, I consider it to be his jury. And we, together, agree on the challenges. And that particular offended my client to the extent that he didn't like that particular body language.
>
> Now, as to the other person, that would be Mr. Ingram. And Mr. Ingram, again, was a person who was not in the initial panel. And my client, himself, wanted the most jurors from the initial panel because those were the ones that were questioned the most.
>
> Now, as far as a reason for Mr. Ingram, he not only displayed--- he was an older person. We were concerned about his hearing ability, I believe. And my client was, also. He had extremely gray hair. And he looked like a person who may have difficulty following the entire length of the trial (T 12-1-04, 14-15)

Defendant later explained that he excused juror Donnelly because "according to my client he had a bad feeling about her from not so much--- not racial, but apparently she's a woman that apparently my client felt had an evil look in her eye." (T, 12-1-04, 20)

The trial court allowed the challenge to juror fourteen, Macari because it recalled that she had said she had family or close friends that were police officers (T, 12-1-04, 18). However, it denied the challenges to the other two jurors, Donnelly and Heiser:

> Ms Donnelly had just been put in the jury box. And we questioned her, preliminary. And there was absolutely nothing that she said that would give this Court concern about her ability to be fair and impartial to both the

prosecution and the defense, here. So I'm going to deny that challenge.

And as to Mr. Heiser, I do recall that early on in the jury selection process we were questioning all of the jurors about the basic principles of law; that the defendant is presumed to be innocent, he doesn't have to prove his innocence, the prosecution has the burden of proof. And a few of the jurors were still somewhat confused. And Mr. Heiser was one of those jurors. But there were a number of them who were still a little bit confused. But I think that now they all have that straightened out. And they've all said that they're willing to keep that burden on the prosecution.

So, I am going to deny the challenge as to Mr. Heiser.

I am denying the challenge as to Ms. Donnelly and Mr. Heiser as pretextual--- I mean the reasons given as pretextual. And so I'll deny those two challenges, but I'll grant the challenges to Ms. Macari (T, 12-1-04, 19)

A prosecutor cannot use peremptory challenges to strike blacks from a black defendant's jury simply because the jurors are black. By the same token, a defendant may not exercise a peremptory challenge to remove a potential juror solely on the basis of the juror's gender, ethic origin, or race.

In deciding whether a prima facie case has been made out, the court must consider all relevant circumstances, including whether there is a pattern of strikes against jurors of a particular race and the questions and statements by the party striking the jurors during voir dire and in exercising his peremptory challenges.

The trial court's nullification of the peremptory excusals of Heiser and Donnelly cannot be deemed harmless, because both remained on the jury and rendered a verdict (T, 12-1-04, 22-83; 12-6-04, 123-124). This Court must reverse Defendant's convictions and remand for a new trial.

5

## II
## DEFENDANT-APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO BE PRESENT AND WAS DENIED DUE PROCESS AND HIS SIXTH AMENDMENT RIGHT TO CONFRONTATION WHEN THE TRIAL COURT TWICE REMOVED DEFENDANT FROM HIS TRIAL.

### SUPPORTING FACTS:

In instant case, Petitioner's outbursts were the result of the trial court's refusal to appoint new counsel to represent him. Beginning with a docket conference two months before trial, defendant complained that he had no idea what was going on with his case and that he and his attorney did not communicate. The trial court acknowledged receiving correspondence from Defendant that expressed dissatisfaction with counsel on the first day of trial, but refused to appoint new counsel. Most of his outbursts, outlined in the Statement of Facts above, were renewed requests for new counsel made while the jury was out of the courtroom and he only refused to be present after repeated denials of those requests. His only outburst in front of the jury was when Ethel was asked to demonstrate the relative positions of Michael and Defendant as they broke through her door, and he only asked the jury to pay attention to the facts and proofs. Defendant's behavior did not rise to the level of disrespect.

Defendant was prejudice by his removal from the courtroom. Defendant was in the holding cell through the testimony through the balance of Ethel's testimony and the testimony of Martieasa Armstrong, William Lynch and the Dickersons before the trial court announced that arrangements had been completed to broadcast the trial in the holding cell, so he did not hear that testimony and would not have been much help to his attorney had the two consulted during any breaks. Defense counsel subsequently agreed to waive the

6

production of Cynthia Swinney, a witness that defendant wanted brought in to testify on his

behalf (T, 12-1-04, 134-136; 12-6-04, 55-57). Further, the jury was never instructed that

they could not consider Defendant's absence as evidence against him. In fact, the

prosecutor argued in her closing statement that the outbursts showed that the committed

the charged offenses:

> Ladies and gentlemen, the defendant who you saw in court, when he was in court, he made various outburst (sic). And I just want to address that because in this courtroom setting we're looking at a rather controlled environment where you have deputies who do their jobs, you have attorneys who do their jobs, we have to wait until each one is done, and then the judge controls the courtroom. This is a controlled setting. You sit here and you watch us, and you evaluate the evidence.

> The Defendant was disrespectful, he was disorderly, he behaved in utter disregard for myself, for his attorney, for you, for the judge, and this is in a controlled setting. If this was his behavior in this controlled setting, you can only imagine the hell that he took that family through on the morning of July 1, 2004 (T 12-6-04, 85-86, emphasis added)

This Court must hold that the trial court abused its discretion and deprived

Defendant of due process and his right of confrontation when it removed defendant from

the courtroom during his trial and remand for a new trial.

7

**III**

# THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN DEFENDANT-APPELLANT'S CONVICTION OF FIRST DEGREE PREMEDITATED MURDER AND FIRST DEGREE FELONY MURDER.

## SUPPORTING FACTS:

In this case, the prosecution failed to present insufficient evidence on the essential elements of premeditation and deliberation in Michael's death, and the trial court erred by denying defendant's motion for directed verdict and allowing an unsupported charge of first-degree murder to go the jury. There was no evidence presented at trial to show that defendant planned to kill Michael or that he killed him according to a preconceived design, i.e., to take his life in a particular way for a particular reason. Defendant's statement, introduced as substantive evidence in the prosecution's case-in-chief, indicated that defendant was mad after being accused of being a "tree jump" and thought Michael was coming after him, consistent with an unpremeditated death, committed in the heart of the moment, characterized by a though process clearly affected by hot blood, as opposed to a premeditated killing following an inteval during which there was an opportunity for cool-headed reflection:

(1) There was no evidence of a previous relationship establishing a motive or any reason to seek revenge against Michael or any evidence of prior threats or ill feelings between defendant and Michael.

(2) There was no evidence that the knife was acquired or positioned in preparation for the killing.

(3) There was no evidence that defendant intentionally arranged the circumstances leading to Michael's death. No one testified when defendant went to the Woodger house

8

or why he went there, other than to confront Michael's accusations that he was a "tree jumper".

(4) There was no evidence that the circumstances of the killing itself were consistent with an organized and preconceived plan. To the contrary, the killing was committed during the heart of an argument.

(5) There was no evidence from which a preconceived plan to kill could be inferred.

(6) There was no evidence of a beating or attack lasting any significant period of time.

(7) There was no evidence that Michael was taken to a secluded or desolate location before the stabbing. To the contrary, he was stabbed in the foyer of his mother's home in front of several eyewitnesses.

In this case, the prosecution failed to prove the commission of a first degree home invasion, and therefore, also failed to prove the requisite elements of felony murder. The prosecution charged, and the jury was instructed, that Defendant's intent, when he broke and entered the house, was to commit either first-degree criminal sexual conduct or kidnaping (T, 12-06-04, 117-118), and the prosecution presented no evidence from which that intent could be inferred. There was no testimony from which it could be inferred that Defendant knew that Juaniva was home at the time he broke into the Woodger home, and she arrived on the scene after Ethel had been hit and Michael had dropped to the floor after being stabbed (T, 12-4-04, 122). It cannot be inferred that defendant intended to commit first degree criminal sexual conduct at the time he broke in, because Juaniva unequivocally testified that after he stabbed her, Defendant picked her off the floor by her shirt, causing it to rip open (T, 12-2-04, 124). She did not testify that Defendant tore it with

9

any sexual purpose in mind. The sexual assault occurred several hours after the initial break-in, and only after Defendant said many times to "let him think." Likewise, there was nothing from which it could be inferred that Defendant intended to kidnap Juaniva, because she was the one who ran off of the front porch after Defendant broke the front window to divert attention away from the people still in the house and to get help (T, 12-2-04, 126-127). Accordingly, the convictions should be reversed and vacated.

## IV
## THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN DEFENDANT-APPELLANT'S CONVICTION OF KIDNAPPING.

### SUPPORTING FACTS:

Defendant was only charged with, and the judge only instructed the jury on, forcible confinement kidnapping. (T, 12-6-04, 68).

A review of the evidence presented in this case shows that Juaniva's asportation was incidental to her stabbing. Defendant caught up with Juaniva, who had fled from the front porch to get help and to divert attention from others in the house, only after she had knocked over some garbage cans. He stuck a knife to her side and the two wandered aimlessly on the streets for at least two hours before Defendant temporarily left, giving Juaniva an opening to get help. The asportation had no significance that was independent of Defendant's attempt to conceal Juaniva's stabbing.

There was insufficient evidence to demonstrate that the purpose of the movement was for the kidnapping because there was no evidence that Juaniva was moved for the purpose of maliciously confining her against her will. If such were the case, Defendant would have kept her in the cemetery, and not parade her around the neighborhood in full view of everyone who lived there. At worst, the asportation was incidental to Defendant's criminal sexual conduct he began the unwanted touching as soon as they got to the cemetery. The confinement and asportation did not precede or follow the other alleged offenses, but were part and parcel of them.

Adams holds that whether the movement enhances danger is a factor in deciding where there her been asportation. Here there was no movement to a place of greater

11

danger. The walk through the neighborhood was conducted on public streets, which only enhanced chances of detection. Viewing the evidence in a light most favorable to the prosecution there was insufficient evidence for a jury to find that the movement of Juaniva was enough to supply the essential element of asportation. Consequently, this Court must reverse Defendant's kidnapping conviction.

# Order

**Michigan Supreme Court**
**Lansing, Michigan**

January 29, 2007

Clifford W. Taylor,
Chief Justice

132332

Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman,
Justices

PEOPLE OF THE STATE OF MICHIGAN,
      Plaintiff-Appellee,

v

MATTHEW BRYANT,
      Defendant-Appellant.

SC: 132332
COA: 260768
Wayne CC: 04-008886-01

_____/

    On order of the Court, the application for leave to appeal the September 14, 2006 judgment of the Court of Appeals is considered, and it is DENIED, because we are not persuaded that the questions presented should be reviewed by this Court.



    I, Corbin R. Davis, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.

January 29, 2007

_____
Clerk

t0122

Matthew Bryant #520017
Earnest C. Brooks Correctional Facility
2500 S Sheridan Dr
Muskegon Heights, MI 49444

Dated

Clerk
Michigan Supreme Court
P.O. Box 30052
Lansing, Michigan 48909

  RE: PEOPLE V MATTHEW BRYANT
     Supreme Court No. _____
     Court of Appeals No. 260768
     Trial Court No. 04-008886-01

Dear Clerk:

Enclosed for filing in the above captioned case, please find the original of the pleadings
checked below:

  [X] Affidavit of Indigency and Proof of Service
  [X] Pro Per Application for Leave to Appeal
  [X] Court of Appeals Decision
  [X] Court of Appeals Brief
  [ ] Supplemental Court of Appeals Brief
  [ ] Other (explain)

I am indigent and cannot provide the seven copies.  Thank you.

Sincerely,

_____
Matthew Bryant

cc: County Prosecutor

-2-

## STATE OF MICHIGAN
## IN THE SUPREME COURT

**PEOPLE OF THE STATE OF MICHIGAN,**

      Plaintiff-Appellee,

                            Michigan Supreme Court No._____

-v-

                            Court of Appeals No.260768

**MATTHEW BRYANT,**

      Defendant-Appellant.      Trial Court No. 04-008886-01

_____/

Wayne County Prosecutor
Attorney for Plaintiff
1441 St Antoine St
Detroit, MI 48226

Matthew Bryant #520017
Defendant in Pro Per
Earnest C. Brooks Correctional Facility
2500 S Sheridan Dr
Muskegon Heights, MI 49444

_____/

## PRO PER APPLICATION FOR LEAVE TO APPEAL

      Defendant - Appellant Matthew Bryant, was found guilty on December 7, 2004, of First Degree Premeditated Murder MCL 750.316; First Degree Felony Murder, MCL 750.316; Kidnapping, MCL 750.349; Two Counts of Assault With Intent to do Great Bodily Harm Less than Murder, MCL 750.84 and First Degree Criminal Sexual Conduct, MCL 750.520b. The proceeding was a jury trial. Defendant-Appellant was sentenced by the Honorable Cynthia Gray Hathaway of Wayne County on January 12, 2005, to a term of Life, 50 to 75, 6 to 10.

Defendant-Appellant is currently in prison at the Earnest C. Brooks Correctional Facility, 2500 S Sheridan Dr, Muskegon Heights, MI 49444. The Michigan Court of Appeals affirmed Defendant-Appellant's conviction and sentence on September 14, 2006. A copy of the decision is attached. This application is filed within 56 days of the Court of Appeals decision.

## STATEMENT OF FACTS

Defendant-Appellant Matthew Bryant, was originally charged with first degree murder, MCL 750.316, felony murder, MCL 750.316; kidnapping, MCL 750.439; assault with intent to murder, MCL 750.83; first degree criminal sexual conduct, MCL 750.520b and assault with intent to do great bodily harm less than murder, MCL 750.84. Following a preliminary examination, the assault with intent to murder count was reduced to assault with intent to do great bodily harm (PE 85-90). The trial court denied the prosecution's trial day motion to reinstate assault with intent to murder. (11-29-04, 16)

Defendant expressed his frustration with the case against him and inadequacies of his legal representation from the beginning. He was removed from his preliminary examination after several outbursts (PE, 41-43). At his docket conference, he told the trial court that he had no communication with his attorney and that he felt rushed into trial (T, 9-21-04, 3-4). At the conference, Defendant was warned that if he did not act in an orderly manner, he would be removed from the courtroom. (T, 9-21-04, 4).

Defendant was still not happy with the way his attorney was handling his case by the time of his trial, when the trial court addressed a letter he had sent expressing dissatisfaction with his attorney (T, 11-29-04, 3-6). The trial court refused to replace

-3-

Defendant's attorney and warned him that he would be tried in absentia if he did not

behave himself (T, 11-29-04, 7). Defendant behaved himself during the Walker hearing

held immediately before jury selection, but became disruptive after the trial court refused

to suppress his statement to police, accusing the court of trying to "railroad" him, but did

not actually say that he did not want to be present in court:

MR BRYANT, you're requesting that you not be present at your trial?

THE DEFENDANT: Listen, you do what you wanna do, 'cause you already
just --you-- y'all do what you wanna do. You're makin' me--- you're said
you're doin' what you wanna do. Do what you wanna do. I ain't got notin' --
it's outa' my hands.

THE COURT: I'm not doing what I want to do, I'm doing what--

THE DEFENDANT: You already---you already--you violated my Sixth
Amendment and my fourteenth Amendment. And then you sittin' up there
lettin' these people do what they wanna do to me. Wasn't no lawyer present
and I asked for that.

THE COURT: I'm sure that there wasn't a lawyer present.

THE DEFENDANT: I asked for that. I'm just tryin' to tell you what---

THE COURT: (Interposing) I'm convinced that a lawyer was not present.

THE DEFENDANT: I asked for that. I'm tellin' you what happened. The man,
he sat there and we talked.

THE COURT: All right. You don't want to be present during your trial?

THE DEFENDANT: We talked. You do what you wanna' do. Do what you
wanna' do.

THE COURT: All right. I'll bring you out here, and if you misbehave then
you're going back. (T, 11-29-04, 78-80)

During the early stages of jury selection, a courtroom deputy admonished someone

to be quiet, and after the jury had been excused for lunch, Defendant told the trial judge

-4-

that he had asked a juror "what he lookin' at me for."(T, 11-29-04, 84,89). After being ordered to not address comments to the jury, Defendant asked for the first time to "do the trial without me." (T, 11-29-04, 98) However, he remained (T, 11-29-04, 102). During a break in the selection, the trial court complimented Defendant on his behavior to that point and expressed hope he could remain for the entire trial (T,11-29-04, 136). However, Defendant asked for a "judge trial" and still expressed concern that he was not prepared for trial. (T,11-29-04, 137). Before court adjourned for the day, Defendant told the trial judge that he did not want the media in the courtroom because "they make me look like this monster I'm not (T, 11-29-04, 166).

At the end of the second day of jury selection, Defendant's renewed request for new counsel was summarily denied by the trial court without hearing his reasons (T,11-29-04, 102). After the trial court denied Defendant's peremptory excusal of three Caucasian witnesses the he was "quite adamant" about excusing on *Batson* grounds, this exchange occurred:

THE DEFENDANT: I just want a fair trial, your Honor. You're not givin' me a fair trial. You're not even givin' me good---

THE COURT: (interposing) I'm going to deny it. I'm going to deny it.

THE DEFENDANT: You're denyin' me everything.

THE COURT: I have not denied--you're only upset about the rulings that I make against you, Mr Bryant.

THE DEFENDANT: You denied me a counselor.

THE COURT: Everything that I've ruled in your favor, you've been okay about that.

THE DEFENDANT: All I ask---I haven't been this Court---when was the last time I've seened (sic) you, in person to talk to you as far as defense and

-5-

counseling? I don't have that. That's something I don't have. You--you claim
you gonna give me--- I'm not (11-29-04, 103-104)

The Jury selection continued the following day and it was not until after the lunch

break that Defendant renewed his request for new counsel as he was being brought out

for the afternoon session:

THE DEFENDANT: Let me it in the bullpen. You can have court without me.
Just put me in the bullpen.

MR. PLUMPE:[defense counsel] Mr Bryant?

THE DEFENDANT: Let me got. Let me go. He's not doin' nothin' for me.
Please, just get me outa' here. I don't know what the fuck is goin' on. You not
doin' nothin' for me. You're playing me out, man. Just take me back, please?
Please? Please? Please? Just take me back man, Y'all have court without
me.

THE COURT: Mr. Bryant? Mr. Bryant? Mr. Bryant?

THE DEFENDANT: Nothin'.

THE COURT: Mr. Bryant?

THE DEFENDANT: It's my life and he fuckin' ain't doin' nothin' for me.

MR. PLUMPE: Mr Bryant. Mr Bryant.

THE DEFENDANT: Nothin'

THE DEPUTY: We're going to have to address the-we've got to start the
proceedings.

THE DEFENDANT: Listen, man. This guy has not been down to see me. He
just been comin' these last two weeks. I don't even know this guy. He been
sayin' I ain't do no defense, no kinda' defense, nothin' I don't have nothin'.
What I am I sittin' up here for? Nothin'. I'm askin'. (T,11-30-04, 79-80).

Before jury selection continued, the trial judge asked Defendant to sit with his attorney and

to conduct himself in a civilized way and warned him that if he had outbursts in front of the

jury, he would be taken to detention (T,11-30-04, 81-82). Defendant refused to sit with his

-6-

attorney at the defense table, but agreed to remain in the "prisoner box." (T,11-30-04, 82).
He remained in the "prisoner box" through opening statements (T, 11-30-04, 88-104). He
remained in the "prisoner box" through the testimony of the medical examiner, who testified
that decedent Michael Woodger (Michael) suffered a single stab wound to the lower
neck/upper chest just below the "notch of the breastbone" that punctured both lungs and
aorta causing internal bleeding into the chest, opined that such a injury was not consistent
with running into the knife by accident, and testified that Michael died of a single stab
wound to the chest caused by a homicide (T,11-30-04, 110-113).

After the medical examiner testified, defense counsel informed the trial court that
Defendant had indicated that he wanted to rejoin him at the defense table and promised
to behave. The trial court denied Defendant's request to rejoin his attorney:

> I think at this point, Mr Bryant has clearly demonstrated that he is not willing
> to be orderly unless we have either in a detention box or a detention cell.
> And rather than put him back there in the cell I am trying to give him the
> opportunity of being present when his trial is conducted. So, I've got him in
> the prisoner box. And that's where he is going to remain throughout this trial.
> And if he acts up in that box, then he will be taken back to the cell and he
> won't hear any of his trial. All of that is based on his behavior. I've given him
> notice, after notice, after notice. You know, at this point, we now--we started
> out with two deputies, then we went to three deputies, and now we've got
> four or five deputies because Mr.Bryant's behavior, not anybody else's but
> his. And security for everyone is important, including him. His security is
> important, because I assure you that if he tries to act up it's very likely he
> could be facing some serious injuries, if necessary. So, it's his security I'm
> concerned about, as well as everybody else's (T 11-30-04, 119-120).

Defendant watched the remainder of the third day of trial from the "prisoner box" and
heard Ethel Woodger's (Ethel) preliminary testimony that she lived on Gardendale street
in Detroit on July 1, 2004 with her son Michael, 19; grandchildren Shaneida, 14; Kenneth,
10; niece Martreasa Isom (Martreasa) and Junior Isom, that she had another daughter

-7-

named Juaniva Woodger (Juaniva) and that she had know Defendant for about 20 years

from the neighborhood (T, 11-13-04, 121-123). Defendant also heard Ethel testify that she

woke at about 2:00a.m. to banging on her front door that sounded like someone shooting

and when she asked loudly who was at her door, she heard Michael say "[m]a, it's me

open the door." (T, 11-30-04, 125-126). Before she could open the door it "pushed" open

(T11-30-04, 126; 12-2-04, 34).

On the following day, however, Defendant interrupted Ethel as she was asked to

demonstrate the grip Defendant had on Michael as the went through the broken front door:

MR BRYANT: She's lying. She's straight lying. She's lying.

BY MS. BRUE [prosecutor]:

Q. So one arm is around Mike's throat; is that correct?

THE COURT REPORT: I can't hear you.

MR BRYANT: You lying. You telling a lie. You know you lying.

THE COURT: Excuse me. Excuse me. Mr Bryant, we had a discussion about this.

MR. BRYANT: You already disc(sic) me. You can sit me in the bull pin (sic). I'd rather be out there than be out here.

THE COURT: That's okay. That's all right.

MR. BRYANT: I'm getting railroaded. You not giving me a fair trial.

THE COURT: All right. Continue.

BY MS. BRUE:

A. And the arm that was around me---

MR. BRYANT: She's lying. She lying. Play attention (sic) to facts and proof. She lying. Make senses, commonsense, pay attention to that. My life is a in y'all hands. Pay attention to it. Deal with the facts. She's lying.

-8-

THE COURT: Mr. Bryant, are you going to be orderly?

MR. BRYANT: She's lying. Pay attention to the facts.

THE COURT: Only one person can talk at a time. Mr. Bryant.

MR. BRYANT: Pay attention to the facts, please. That's all I'm asking y'all.
My life is in y'all hands. Pay attention to the facts and proofs (12-2-04, 6-7)

After the jury was excused, Defendant was taken out of the courtroom (T, 12-2-04, 8). In
Defendant's absence, Ethel testified that Defendant was already stabbing Michael in his
upper torso as he came through the door, telling Michael "bitch, you ain't gone call me
some type of name" and punching him, causing Michael to eventually drop to the floor (T,
12-2-04, 9-12). As Michael lay on the floor, Defendant kept punching and kicking him and
saying "you won't call me...a tree something." (T, 12-2-04, 12) When Ethel asked
Defendant what he was doing to Michael, Defendant said "you better call the ambulance
cause when the ambulance get here he'll be dead." (T,12-2-04, 11-13. Ethel told jurors
Michael tried to talk, but was unable to (T, 12-2-04, 13).

Ethel tried to help Michael by hitting Defendant "with all my force," but Defendant
pushed her against the door jamb and she hit her head so hard that she still suffered
headaches, and came at her with the knife, saying "[bitch, you want some of this too" and
"bitch by the time you call the ambulance he dead. I know he dead." (T12-2-04, 13-16).
Ethel heard Juaniva ask Defendant what was going on, he said "bitch, you the one I want
to kill anyway," say Defendant stab Juaniva in her side and take Juaniva with him outside
to the porch (T12-2-04, 17-18). By the time Ethel finished talking with emergency services
on the telephone, Defendant and Juaniva were gone and she did not see Juaniva again
for about five or six hours (T 12-2-04, 19,21) She denied that Juaniva and Defendant had

-9-

any type of romantic relationship (T 12-2-04, 20,52).

After Ethel testified, defense counsel asked the trial court to "wire the back" so that Defendant could at least hear his trial (T 12-2-04, 63). The trial court indicated it would do so if it could get it reasonably done during lunch, but "if it's going to cause the same kind of disruption and improper conduct that the Defendant has been displaying ever since, I guest probably he was arrested, then I'm not going to feel compelled to accommodate him any further." (T12-2-04, 63)

Martieasa Armstrong, who was in the basement, told jurors Shaneida came down to say Michael was lying on the ground upstairs, so she went up to investigate, saw Michael bleeding from his upper body, heard glass breaking, saw Juaniva duck on the wicker love seat and run off the porch (T 12-2-04, 66-75, 80). She got a knife from the kitchen "for protection" and saw Defendant chase after Juaniva (T12-2-04, 75-76). Her identification of Defendant was made without the jury present after he was brought back into the courtroom (T 12-2-04, 88).

When neighbor William Lych's dog woke him at about 2:30 a.m., he went to the window and saw a man carrying a limp woman across the street, then saw the man standing over the woman, pointing his finger or hand "up and down" as she lay on the ground (T, 12-2-04, 92-95). It was apparent to him that the woman was hurt (T, 12-2-04, 94). He tried calling police twice (T 12-2-04, 94). When he returned to his window after the second call, the man was gone, but the woman struggled to get up, holding her side, and staggered to a porch, where she looked both ways, then managed to hide between two doors before "letting herself in." (T, 12-2-04, 96-98). Carolyn and Charles Dickerson woke to the sound of glass breaking, heard a muffled female voice, and thought it was one of

-10-

their daughters (T, 12-2-04, 104-105, 110-111). The woman at the bottom of the stairs was not their daughter, apologized to Carolyn for breaking into the house and begged to "don't let him get me again." (T, 12-2-04, 106, 111-112) She also told Carolyn that "he" had taken her to the woods, where "he" "raped" and stabbed her (T,12-2-04 107, 113) Police came five to ten minutes after Charles' second call (T, 12-2-04, 115)

During the lunch break after the Dickersons testified, Defendant was brought back into the courtroom and told that he would be able to hear his trial from the detention cell as long as he was not disruptive (T12-2-04, 116). This exchange occurred:

MR BRYANT: You don't have to do nothing for me. Go head with that.

THE COURT: If he does that---

MR BRYANT: You violated me. You ain't gotta do nothing for me. You already violated me.

THE COURT: If he does that, as he's doing right now, screaming out loud in the courtroom, hollering over the judge, trying to talk at the same time the judge is trying to talk, then the Defendant is going to have to be taken back to the Wayne County Jail and remain there until this trial is concluded.

MR BRYANT: Do that. I'm good. Do that. I'm good. It's nothing you can do for me. Do that. You already -- fake ass fucking lawyer -- come on, man.

THE COURT: Continue. Continue.

MR BRYANT: Do that. I'm good. Let the mother do that. I'm good. I'm good. I'm not gone sit up here while they be fabricating, adding things to the case. You done already violated me.

THE COURT: Okay.

MR BRYANT: (sic) Then he's going to be taken back to the Wayne County Jail until this trial is completed. (T 12-2-04, 116-117).

Before being take to the jail, Juaniva identified Defendant out of the jury's presence (T, 12-2-04, 118-119).

-11-

In Defendant's absence, Juaniva told jurors she woke up to screaming, banging and scuffling and saw her mother rubbing the back of her head and Defendant holding a knife and standing over Michael, who was wheezing and gasping for air as he lay on the floor (T, 12-20-04, 121-122; 12-3-04, 14). As she walked towards Michael, Defendant grabbed he by her hair, told her "[y]ou're the one I wanted," stabbed her, causing her to fall down, then lifted her by here shirt, causing it to rip (T, 12-2-04 123-124). After Defendant dragged her out the front door, she sat on a wicker chair as Defendant yelled "don't call the ambulance cause that nigra is dead" and punched his fist through the window (T, 12-2-02, 124-126) Juaniva ran off the porch in an effort to distract Defendant (T, 12-2-04, 126) The stab wound kept her from getting far, and Defendant caught up with her after she ran into a garbage can, pulled her up by her hair, held the knife to her side and told her to not run away again or he would kill her (T, 12-1-04, 126-128).

Juaniva testified that for awhile, Defendant alternated between saying that Michael had called him a "tree jumper" and saying "let me think". (T, 12-2-04, 128) As they rounded the corner of Picadilly Street, Muaniva told Defendant that she needed an ambulance, but his response was to "shut the fuck up, you'll be all right." (T, 12-2-04, 129). Her bracelet broke and came off as Defendant pulled on her to accompany him down the street (T, 12-2-04, 129; 12-3-04, 4, 54-55). Defendant continued to tell her to "shut the fuck up" as he cut down Chippawa Street, acted as if they were kissing "threw" her over a gate as a police cruiser drove by (T, 12-2-04, 128-131). When the homeowner came out to investigate the commotion, Defendant, who held the knife to her side, warned her he would kill her if she said the wrong thing, so she told the homeowever that she was looking for a shoe Defendant had thrown (T, 12-2-04, 131-132) Defendant then "threw" her back over the

-12-

gate and took her across the street to a wooded area, where he mumbled that he had waited on the hood of her brother's car for two hours and had told others "he was gone to hit that nigga." (T, 12-2-04, 132-135). As police drove by again, Defendant pushed her on the ground, eventually removed her pants and undergarments and penetrated her with his penis (T,12-2-04, 135-140). He then "snatched" her up and walked her to a house on the corner, saying that he was taking her to a friend's house (T, 12-2-04, 141) After more pleading by Juaniva to get an ambulance, a neighbor caught Defendant's attention and Defendant walked to the corner, and was touching his pants where he apparently had put the knife when he returned, so he left to look for it (T, 12-2-04, 142-144) Meanwhile, Juaniva broke into a nearby house and was able to get help (T, 12-2-04, 145-146).

When police arrived at Ethel's house, they saw the front window broken and Michael lying in the doorway in a pool of blood suffering from a stab would to his neck (T, 12-3-04, 31-32). They followed a blood trail that began on Ethel's porch and ended at a running water picket (T, 12-3-04, 35-38, 51-54). Police eventually found a distraught Juaniva at a nearby home she had broken into suffering from a knife or puncture would to her right lower abdomen (T12-3-04, 38,45) They were unable to find any perpetrators, even though a canine handler had found Defendant's wallet near a cemetery (T, 12-3-04, 46; 12-3-04, 21-24) They subsequently recovered the knife at 19915 Lichfield Street (T12-3-04, 58-60) Defendant was arrested between 4:30 p.m. and 5:00p.m. at a house on Wisconsin Street (T, 12-6-04, 4-9, 10-14)

DNA analysis of blood found on Ethel's porch, a car parked in her driveway, a pair of jeans and a pair of shoes was consistent with Juaniva's genetic profile (T, 12-6-04, 35, 39). DNA analysis of the sperm cell fraction of a vaginal swab was consistent with

Defendant's DNA profile, and the odds that someone other than Defendant had the same

profile was determined to be one in 14 quintillion (T, 12-6-04, 38,41).

Defendant's statement to police was read:

> Something took place last night at my mother's house. Last night with
> the girl name (sic) Kim. She is a friend of my brother's, James Warren. I went
> to the bathroom and came back upstairs, no, downstairs to the basement.
> My brother James left and came back. Kim told my brother I was feeling on
> her because her pants were part of the way down.

> My brother and Bruno went down the block and talked to her. Bruno
> came back and asked my why I did that to her. Bruno called me a tree
> jumper with one P. You know, a tree jumper is a child, you know, a person
> that has sex with children. Man I was mad. I went to talk with Bruno. The
> front door to the house was open. I thought he was coming after me. I
> stabbed him in the shoulder. He fell through the door. I told him don't ever
> call me a tree jumper.

> His mother and Ne-Ne were on my back. I cut her on the side. She
> told me to stop and then she ran out the house. I followed her. She was
> shouting the whole way to the grave yard. That's where we sat at until I left.

> Question, how many times did you stab Bruno?
> Answer once.
> Question how many times did you stab Ne-Ne your girlfriend?
> Answer once by mistake. That's when we went by the grave yard to talk. She
> had blood on her pants.
> Question Did you make any notes regarding this incident?
> Answer, Yes. I wrote my intentions weren't to kill anyone, and if anything took
> place with me give my mother my kidney. I didn't mean to kill Bruno (T, 12-6-
> 04, 49-50).

Before testimony was taken on the sixth day of trial, defense counsel told the trial

court that he had spoken with Defendant "at length" at the Wayne County Jail and that

Defendant had reiterated that he did not want to participate in the trial and that he felt that

he was being "railroaded" (T, 12-6-04, 3). He did decide to be present for the verdict, which

was punctuated by outbursts as the verdict was read and the jury was polled (T, 12-7-04,

10-14) The jury found Defendant guilty as charged (T, 12-7-04, 10-14).

-14-

At sentencing, Defendant tried to interrupt discussions of the sentencing guidelines for the non-capital felony offenses, allocution by a member of the Woodger family and his own attorney's allocution (ST, 4-13) When asked to allocate, Defendant continued to insist that his trial was unfair and that he wanted his attorney replaced (ST, 13-116) Defendant was sentenced to a terms of life in prison without the possibility of parole for first degree murder, 50 to 75 years for kidnaping and first degree criminal sexual conduct and six to ten years for assault with intent to do great bodily harm less than murder (ST, 16-18) Currently incarcerated, Defendant appeals of leave and raises four issues of error.

## GROUNDS - ISSUES RAISED IN THE COURT OF APPEALS

I want the Court to consider the issues as raised in my Court of Appeals brief

and the additional information below.

### ISSUE I

**THE TRIAL COURT IMPROPERLY NULLIFIED DEFENDANT-APPELLANT'S PEREMPTORY CHALLENGES AGAINST TWO JURORS, FINDING THAT DEFENSE COUNSEL HAD EXERCISED THE CHALLENGES IN A RACIALLY DISCRIMINATORY MANNER.**

The Court should review the Court of Appeals decision on this issue because:



_____ The issue raises a serious question about the legality of a law passed by the legislature.
✔___ The issue raises a legal principle which is very important to Michigan law.
✔___ The Court of Appeals decision is clearly wrong and will cause an important injustice to me.
✔___ The decision conflicts with a Supreme Court decision or another decision of the Court of Appeals.

### Standard of Review & Issue Preservation

The proper standard of review depends on which *Batson* step is at issue

before this Court. *People v Knight*, 473 Mich 324, 338; 701 NW2d 715 (2005). When the

prima facie showing of discrimination by the opponent is at issue, review of the factual

determinations is for clear error and review of the trial court's conclusions of law is *de novo.*

Id., 342. When the issue is whether the proponent of the peremptory challenge articulated

a race-neutral reason for the use of the peremptory challenge, review is *de novo.* Id.,

3443-344. Whether the opponent of the peremptory challenge has satisfied the ultimate

burden of proving purposeful discrimination is a question of fact reviewed for clear error.

Id., 344.

This issue was preserved when the trial court sua sponta raised the *Batson* issue

(T, 11-30-04, 102-104; 12-1-04, 7-20). *People v Bell* (On Reconsideration), 259 Mich App
583, 587-589; 675 NW2d 894 (2003).

## Discussion

Close to the end of the first day of jury selection, Defendant peremptory removed
jurors 12, 13 and 14 (T, 11-30-04, 101) After the jury was excused for the day, the trial
court denied the challenges because they appeared to be based on race, pointing out that
Defendant's previous peremptory excusals had been against white men and he had begun
peremptorily white females (T, 11-30-04, 102) Following a bench conference where the
prosecutor asked the trial judge to delay its ruling so that a record could be made, court
recessed (T, 11-30-04, 104; 12-1-04, 8).

The matter was revisited before jury selection resumed the following day. The
prosecution pointed out that initially, Defendant exercise peremptory excusals against
white male jurors, then began peremptorily excusing white female jurors:

> None of these jurors indicated that they had police officer friends.
> There were some jurors who the defense excused who said that they knew
> police officers. But the Court didn't neither did I, I had no objection to that.
> But these people didn't have any reason. There was no religion, there were
> no police officers, there were no people in their families who had been
> convicted or murder, or victims of their families who had been victims of
> murder or any assault cases. There simply just was not articulable reason,.
> Race-neutral reason, given from the defense (T, 12-1-04, 11)

The defense gave these reasons for exercising the peremptory challenges:

> Now, I mentioned briefly, yesterday, that I will give a reason for the last three,
> that is race-neutral. As far as Ms. Macari, number fourteen, she does have
> a police officer in her background. I wrote down, 'Police."

THE COURT: I think I remember that.

MR. PLUMPE:[defense counsel]: Correct.

-17-

THE COURT: I think that's accurate. Okay.

MR. PLUMPE: And as to Mr. Heiser, we had quite an extended discussion, during voir dire, about the issues of reasonable doubt and so forth.

In addition to that I noticed, and my client probably did too, that he was slouching his shoulders at a significant time during questions. Therefore- - and granted, I was acting in response to my client, because I consult with him, I consider it to be his jury. And we, together, agree on the challenges. And that particular offended my client to the extent that he didn't like that particular body language.

Now, as to the other person, that would be Mr. Ingram. And Mr. Ingram, again, was a person who was not in the initial panel. And my client, himself, wanted the most jurors from the initial panel because those were the ones that were questioned the most.

Now, as far as a reason for Mr. Ingram, he not only displayed--- he was an older person. We were concerned about his hearing ability, I believe. And my client was, also. He had extremely gray hair. And he looked like a person who may have difficulty following the entire length of the trial (T 12-1-04, 14-15)

Defendant later explained that he excused juror Donnelly because "according to my

client he had a bad feeling about her from not so much--- not racial, but apparently she's

a woman that apparently my client felt had an evil look in her eye." (T, 12-1-04, 20)

The trial court allowed the challenge to juror fourteen, Macari because it recalled

that she had said she had family or close friends that were police officers (T, 12-1-04, 18).

However, it denied the challenges to the other two jurors, Donnelly and Heiser:

Ms Donnelly had just been put in the jury box. And we questioned her, preliminary. And there was absolutely nothing that she said that would give this Court concern about her ability to be fair and impartial to both the prosecution and the defense, here. So I'm going to deny that challenge.

And as to Mr. Heiser, I do recall that early on in the jury selection process we were questioning all of the jurors about the basic principles of law; that the defendant is presumed to be innocent, he doesn't have to prove his innocence, the prosecution has the burden of proof. And a few of the jurors were still somewhat confused. And Mr. Heiser was one of those jurors.

-18-